EXHIBIT 2

Case 2:21-cv-02165-FLA-PD    Document 75-2    Filed 04/24/25    Page 2 of 12    Page ID
#:625
Case 2:21-cv-05209-HDV-GJS    Document 90    Filed 09/13/24    Page 1 of 11    Page ID
#:2168

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         CENTRAL DISTRICT OF CALIFORNIA

10

11   WAYMON STARKS, WENDELL          Case No. 2:21-cv-05209 HDV GJSx
     WILLIAMS, and MICHAEL STARKS,
12                                   **ORDER GRANTING DEFENDANTS'**
13                Plaintiffs,        **MOTION FOR SUMMARY JUDGMENT**
                                     **[DKT. NO. 84]**
14   v.

15
     COUNTY OF LOS ANGELES, SHERIFF
16   ALEX VILLANUEVA, EDWIN BARAJAS,
17   TAYLOR INGERSOLL, and DOES 1
     through 10, inclusive,
18
                  Defendants.
19

20

21

22

23

24

25

26

27

28

                                       1

Case 2:21-cv-02165-FLA-PD   Document 75-2   Filed 04/24/25   Page 3 of 12   Page ID
#:626
Case 2:21-cv-05209-HDV-GJS   Document 90   Filed 09/13/24   Page 2 of 11   Page ID
#:2169

## I.   INTRODUCTION

This Section 1983 action arises out of a 2019 law enforcement vehicle pursuit that resulted in the fatal shooting of Rickie Starks, as innocent bystander.  Mr. Starks' brothers—Plaintiffs Waymon Staks, Wendell Williams, and Michael Starks—assert claims under the Fourth and Fourteenth Amendments against the County of Los Angeles, Sheriff Alex Villanueva, Deputy Edwin Barajas, and Deputy Taylor Ingersoll (collectively, "Defendants").

Before the Court is Defendants' Motion for Summary Judgment ("Motion").  [Dkt. No. 84]. For the reasons discussed below, the Court finds that Defendants have established the absence of any genuine disputes of material fact on all of Plaintiffs' six claims, and on that basis grants the Motion.

## II.   BACKGROUND

### A.   Factual Background

On July 3, 2019, Defendants Taylor Ingersoll and Edwin Barajas (together, "Deputy Defendants"), both Los Angeles County Sheriff's Department Deputies, were transporting a prisoner to a detention facility in Lynwood, CA.  Statement of Uncontroverted Facts ("SUF") ¶ 1 [Dkt No. 84-8].  Barajas was driving a marked Los Angeles Sheriff's Department patrol vehicle with Ingersoll in the front passenger seat.  *Id.* ¶ 2.

After Deputy Defendants witnessed a black Cadillac Escalade SUV run two red traffic lights and a stop sign, Barajas activated his emergency lights and siren to conduct a traffic stop.  *Id.* ¶ 3, 5– 6.  The Escalade failed to yield and Ingersoll radioed that they were in pursuit.  *Id.* ¶ 7.  While doing so, the Deputy Defendants heard what sounded like a gunshot.  *Id.* ¶ 9.  As they closed the distance between the Escalade and their patrol vehicle, the Deputy Defendants saw numerous muzzle flashes from the rear of the Escalade.  *Id.* ¶ 12.  Ingersoll radioed that they were "taking rounds, we're taking rounds, taking rounds," meaning they could hear their patrol vehicle being hit by bullets coming from the Escalade.  *Id.* ¶ 14.

Barajas slowed the patrol car to attempt to increase the distance between the two vehicles, but the Escalade also slowed down and continued to fire at the Deputy Defendants.  *Id.* ¶ 15–16. When the Escalade turned north, Ingersoll reportedly saw a suspect in the vehicle shooting "what

1  appeared to be a rifle" at them.  *Id.* ¶ 18.  The subsequent investigation revealed that the suspect had

2  been firing an AK-47 assault rifle.  *Id.* ¶ 19.

3      In response, the Deputy Defendants fired their department-issued 9mm Sig Sauer duty

4  handguns through the windshield of their patrol vehicle towards the back window of the Escalade as

5  their vehicle came to a stop.  *Id.* ¶ 21.  Their patrol vehicle became disabled as a result of being shot

6  approximately thirty times from the suspect's AK-47.  *Id.* ¶ 31.

7      Immediately, Deputies Cuevas and Benzor took over pursuit of the Escalade.  *Id.* ¶ 33.

8  Deputies Miller and Marr also pursued from their Air 22 helicopter.  *Id.* ¶ 40–41.  Miller observed

9  the Escalade traveling between 100 and 120 miles per hour and through several red traffic lights

10  without slowing.  *Id.* ¶ 43–44.  The suspect in the Escalade shot the AK-47 rifle at the Sheriff

11  helicopter approximately four to five times.  *Id.* ¶ 47.  The vehicle pursuit ended when the Escalade

12  stopped just north of 630 West Queen Street.  *Id.* ¶ 53.

13      Soon thereafter, the body of Mr. Starks was found on Aranbe Avenue in Lynwood near a

14  fired AK-47 bullet cartridge.  *Id.* ¶ 17.  He was declared dead at the scene.  *Id.*  Neither Deputy

15  Defendant fired a weapon on Aranbe Avenue, where Mr. Starks' body was recovered.  *Id.* ¶ 26.

16  Ingersoll and Barajas reported only firing their weapons in response to the shots coming from the

17  Escalade.  *Id.* ¶ 29–30.

18      The incident resulted in a large, ongoing criminal investigation involving state, local, and

19  federal law enforcement authorities.  *Id.* ¶ 55.  The investigation concluded that the incident was the

20  result of an ongoing pattern of violence and retaliation between rival gangs in the City of Compton.

21  *Id.* ¶ 56.  The investigation also revealed no evidence that any Defendant purposely or accidentally

22  shot Mr. Starks.  *Id.* ¶ 69.

23      Defendants were not aware that Mr. Starks had been shot until it was reported to them by

24  their supervisors after the pursuit had ended, when they were returning to the Sheriff's station.  *Id.*

25  ¶ 23.  Dr. Paul V. Gliniecki, Los Angeles County Coroner medical examiner, reported that

26  Mr. Starks' injuries were "more consistent with a high-powered rifle" to a reasonable, medical

27  probability.  *Id.* ¶ 63–64.  There are charges currently pending for several individuals involved in the

28

Case 2:21-cv-02165-FLA-PD    Document 75-2    Filed 04/24/25    Page 5 of 12    Page ID
#:628
Case 2:21-cv-05209-HDV-GJS    Document 90    Filed 09/13/24    Page 4 of 11    Page ID
#:2171

1  July 3, 2019 incident including, but not limited to, Mr. Starks' homicide, and assault with a deadly

2  weapon upon Mr. Starks and the Deputy Defendants.  *Id.* ¶ 75.

3        **B.**     **State Court Action**

4        On October 28, 2019, Plaintiffs filed a Complaint for Damages in California state court

5  against the County of Los Angeles and the Deputy Defendants, asserting battery, negligence, and a

6  violation of the Bane Act stemming from the same incident.  *Id.* ¶ 77.  Ultimately, the Honorable

7  Mauriece A. Leiter granted Defendants' motion for summary judgment dismissing all of Plaintiffs'

8  claims.  *Id.* ¶ 78.  Plaintiffs appealed and on January 23, 2023, the Second Appellate District Court

9  of Appeal of the State of California affirmed the state court's ruling, finding that no reasonable trier

10  of fact could find for Plaintiffs on the issue of whether Defendants intentionally targeted Mr. Starks

11  during the shootout.  *Id.* ¶ 79.  The Court of Appeal's decision became final on March 28, 2023.  *Id.*

12        **C.**     **Federal Court Action**

13        Plaintiffs initiated this federal action on June 25, 2021.  Complaint [Dkt. No. 1].[1]  On

14  February 7, 2022, Plaintiffs filed the First Amended Complaint.  [Dkt. No. 24].  Defendants filed a

15  Motion to Dismiss Plaintiff's First Amended Complaint, [Dkt. No. 37], which Judge Otis D. Wright,

16  II, denied on September 12, 2022.  Order Denying Defendants' Motion to Dismiss [Dkt. No. 44].[2]

17        On July 3, 2024, Defendants filed the current Motion for Summary Judgment.  [Dkt. No. 84].

18  Plaintiffs, proceeding *pro se*,[3] did not file an opposition and did not appear at the hearing on the

19  Motion.  [Dkt. No. 89].

20  **III.**   **LEGAL STANDARD**

21        Summary judgment should be granted "if the movant shows that there is no genuine dispute

22  as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

23

24  [1] This action was initiated by Mark Starks, Mr. Starks' mother.  *See* Complaint.  After Ms. Starks'
25  passing, Waymon Starks, Wendell Williams, and Michael Starks were substituted as Plaintiffs.  *See*
Order Granting Plaintiff's Unopposed Motion to Substitute Pursuant to Rule 25 [Dkt. No. 73].

26  [2] This action was reassigned to Judge Hernán D. Vera on June 20, 2023.  [Dkt. No. 55].

27  [3] On October 25, 2023, the Court granted Plaintiffs' counsel's Unopposed *Ex Parte* Application to
28  Withdraw as Counsel of Record.  [Dkt. Nos. 68, 70].

1    P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material

2    facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v.*

3    *Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

4    248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a

5    verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

6         The moving party bears the initial burden of establishing the absence of a genuine dispute of

7    material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To carry its burden of production,

8    the moving party must either: (1) produce evidence negating an essential element of the nonmoving

9    party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving

10   party's case. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

11   Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go

12   beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to

13   interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine

14   issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)); *see also Norse v. City of Santa Cruz*,

15   629 F.3d 966, 973 (9th Cir. 2010) ("Rule 56 requires the parties to set out facts they will be able to

16   prove at trial."). "In judging evidence at the summary judgment stage, the court does not make

17   credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509

18   F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable to the

19   nonmoving party." *Id.*

20

21

22

23

24

25

26

27

28

Case 2:21-cv-02165-FLA-PD   Document 75-2   Filed 04/24/25   Page 7 of 12   Page ID
#:630
Case 2:21-cv-05209-HDV-GJS   Document 90   Filed 09/13/24   Page 6 of 11   Page ID
#:2173

IV.   **DISCUSSION**

    A.   **Excessive Force**[4]

    Defendants contend they are entitled to summary judgment on Plaintiffs' excessive force claim because the Deputy Defendants did not intentionally shoot Mr. Starks.  Motion at 15–18.

    Law enforcement's use of excessive force is analyzed under the Fourth Amendment, which provides for the right to be free from unreasonable searches and seizures.  U.S. Const. Amend. IV.; *Graham v. Conner*, 490 U.S. 386, 395 (1989).  To constitute a Fourth Amendment "seizure," a government actor must act with intentionality when applying force.  *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989) ("[A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby) . . . but only when there is a governmental termination of freedom of movement *through means intentionally applied*." (emphasis in original)).  Courts use an objective test to evaluate the intent conveyed, rather than looking to a government actor's subjective intent.  *Villanueva v. California*, 986 F.3d 1158, 1166 (9th Cir. 2021) (citing *Brendlin v. California*, 551 U.S. 249, 260 (2007)).

---

[4] Defendants argue that Plaintiffs' claims are barred by the doctrine of res judicata because the issue of any force allegedly used was decided in the prior state court action.  Motion at 9–15.  Res judicata refers to the preclusive effect of a claim or issue through a prior judgment.  *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).  "Under the doctrine of claim preclusion, a final judgment forecloses successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *Id.* (citation omitted).  "Issue preclusion, in contrast, bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Id.*

However, in his Order Denying Defendants' Motion to Dismiss ("Order"), Judge Wright found that "the primary right [Plaintiffs] placed at issue [in the state court action] is fundamentally different from the primary right [they] place[] in the present case," concluding that since "the two rights are distinct primary rights, [] claim preclusion fails."  Order at 8–9.  The Order also found that the state court issue of whether the deputies' use of force was reasonable is distinct from the issue of whether the deputies used force, as it is presented in this case.  *Id.* at 10.  In short, Judge Wright held that the latter "simply was not litigated in the state court case." *Id.*  Such findings are the law of the case. Based on these prior findings, the Court concludes res judicata does not apply.

Case 2:21-cv-02165-FLA-PD   Document 75-2   Filed 04/24/25   Page 8 of 12   Page ID
#:631
Case 2:21-cv-05209-HDV-GJS   Document 90   Filed 09/13/24   Page 7 of 11   Page ID
#:2174

1    The Ninth Circuit has held that "an innocent bystander struck by a stray bullet from the

2    officer's weapon would not have" a Fourth Amendment claim.  *United States v. Lockett*, 919 F.2d

3    585, 590 n.4 (9th Cir. 1990) (citing *Brower*, 489 U.S.); *see also Rodriguez v. City of Fresno*, 819 F.

4    Supp. 2d 937, 946 (E.D. Cal. 2011) ("[A]n individual who is accidentally shot by police who are

5    attempting to apprehend someone else cannot maintain a Fourth Amendment claim." (citation

6    omitted)).  Here, there is no evidence that any Defendant shot Mr. Starks.  Instead, the undisputed

7    evidence demonstrates that Mr. Starks was shot by a high-powered rifle, and that a suspect in the

8    fleeing Escalade fired an AK-47 assault rifle during the pursuit.  SUF ¶ 19, 20, 25, 27, 63–67.  But

9    even assuming *arguendo* that Mr. Starks was caught in the crossfire by bullets from the Deputy

10   Defendants, there is no cognizable Fourth Amendment claim on this record since there is no showing

11   whatsoever of intentionality.  *See Brower*, 489 U.S. at 595–96 (explaining that "if a parked and

12   unoccupied police car slips its brake and pins a passerby against a wall, it is likely that a tort has

13   occurred, but not a violation of the Fourth Amendment."); *Brendlin*, 551 U.S. at 254; *Villanueva*,

14   986 F.3d at 1166.  For these reasons, summary judgment for Defendants on Plaintiffs' excessive

15   force claim is proper.

16            **B.      Denial of Medical Care**

17            Defendants also move for summary judgment on Plaintiffs' second claim.  A denial of

18   medical care claim by one who has not been charged with a crime is analyzed under the substantive

19   due process clause of the Fourteenth Amendment.  *Lolli v. Cnty. of Orange*, 351 F.3d 410, 418 (9th

20   Cir. 2003) (citation omitted).  To be liable for a denial of medical care, a defendant must know of or

21   disregard an excessive risk to the claimant's health and safety.  *Id.* at 419.  To know of the risk, "it is

22   not enough that the person merely be aware of facts from which the inference could be drawn that a

23   substantial risk of serious harm exists, [] he must also draw that inference."  *Id.*

24            Plaintiffs allege that the Deputy Defendants failed to provide medical care to Mr. Starks and

25   failed to call for timely medical care.  FAC ¶ 74.  They further allege that these Defendants "saw

26   [Mr. Starks], intentionally shot [Mr. Starks], knew that they struck [Mr. Starks] with a bullet from

27   their firearms but did not call for medical attention."  *Id.* ¶ 76.

28

Case 2:21-cv-02165-FLA-PD    Document 75-2    Filed 04/24/25    Page 9 of 12    Page ID
#:632
Case 2:21-cv-05209-HDV-GJS    Document 90    Filed 09/13/24    Page 8 of 11    Page ID
#:2175

1    But while such allegations are sufficient for pleading purposes, the standard on summary

2    judgment requires this Court to look at the evidentiary record.  Here, it is undisputed that the Deputy

3    Defendants did not learn that Mr. Starks was shot until after the shootout occurred, on their way

4    back to the Sheriff's station.  SUF ¶ 23.  Without such contemporaneous information, Deputy

5    Defendants could not have known nor disregarded any risk to Mr. Starks' safety.  This claim fails.

6    **C.    Interference with Familial Relations**

7    In their third claim, Plaintiffs allege the Deputy Defendants violated their right to be free

8    from unlawful state interference with familial relations, which arises under the Substantive Due

9    Process Clause of the Fourteenth Amendment.  FAC ¶ 81–86.  An individual may assert a

10   Fourteenth Amendment substantive due process claim "if they are deprived of their liberty interest in

11   the companionship and society" of a family member through the actions of law enforcement.  *Lemire*

12   *v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) (citing *Wilkinson v. Torres*,

13   610 F.3d 546, 554 (9th Cir. 2010)).  To be recognized as a due process violation, official conduct

14   must "shock the conscience" because the official "had time to deliberate before acting or failing to

15   act in a deliberately indifferent manner."  *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)

16   (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)); *Lemire*, 726 F.3d at 1075

17   (citation omitted).  "[W]here a law enforcement officer makes a snap judgment because of an

18   escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose

19   to harm unrelated to legitimate law enforcement objectives."  *Wilkinson*, 610 F.3d at 554 (citation

20   omitted).

21   Once again, however, there is nothing in the record to support a finding that the Defendants

22   "had time to deliberate before acting."  *Porter,* 546 F.3d at 1137.  To the contrary, the undisputed

23   evidence shows that Defendants "[made] a snap judgment because of an escalating situation" with

24   the Escalade, and acted solely in furtherance of the "legitimate law enforcement objective" of

25   responding to the shots fired from the fleeing vehicle.  *Wilkinson*, 610 F.3d at 554.

26   **D.    *Monell* Claims**

27   Plaintiffs' fourth, fifth, and sixth claims against the County and Sheriff Villanueva for

28   inadequate training, unconstitutional custom, practice, or policy, and ratification arise under *Monell*

1  *v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690–91 (1978).  FAC at ¶ 19–37.

2  Defendants contend that summary judgment must be granted as to these three claims, arguing that

3  there is no evidence: (1) of any policy that caused a constitutional violation of Mr. Starks' rights,

4  (2) that the Deputy Defendants were inadequately trained, or (3) that the County ratified any policy

5  that gave rise to Mr. Starks' injuries.  Motion at 20–22.  The Court agrees.

6  **1.    Failure to Train**

7  A plaintiff can establish municipal liability by demonstrating that the alleged constitutional

8  violation was caused by a failure to adequately train municipal employees.  *City of Canton v. Harris*,

9  489 U.S. 378, 388–91 (1989).  To prove a failure to train, a plaintiff must establish (1) a

10  constitutional violation; (2) of a municipal training policy that amounts to a deliberate indifference to

11  constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality

12  properly trained their employees.  *Benavidez v. County of San Diego*, 993 F.3d 1134, 1153–54 (9th

13  Cir. 2021).  Deliberate indifference requires proof that a municipal actor disregarded a known or

14  obvious consequence of his action.  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

15  Plaintiffs allege that the County's training policies were inadequate to train deputies to safely

16  handle obvious, recurring situations, and that it affirmatively chose a policy that was likely to lead to

17  deprivations of constitutional rights.  FAC ¶ 91.  They further allege that the County's failure to train

18  the Deputy Defendants was so closely related to the deprivation of Mr. Starks' and Plaintiffs' rights

19  as to be the moving force that caused Mr. Starks' death.  *Id.* ¶ 93.

20  There is, however, no evidence of any municipal training policy that amounted to a deliberate

21  indifference to constitutional rights.  There is also no evidence to support Plaintiffs' allegation that

22  Mr. Starks' death would not have occurred if the County offered additional training with respect to

23  tactics and the use of force, including vehicle pursuits, deadly force, or de-escalation techniques.

24  *See id.* ¶ 94.

25  **2.    Unconstitutional Custom or Policy**

26  To establish municipal liability, a plaintiff must show that a "policy or custom" led to the

27  plaintiff's injury.  *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1073 (9th Cir. 2016) (en banc).  A

28  plaintiff must also demonstrate that the policy or custom of a municipality "reflects deliberate

9

1    indifference to the constitutional rights of its inhabitants." *Id.* at 1060 (quoting *City of Canton*, 489

2    U.S. at 392). Official municipal policy includes the decisions of a government's lawmakers, the acts

3    of its policymaking officials, and practices so persistent and widespread as to practically have the

4    force of law. *Connick*, 563 U.S. at 61. Allegations of random acts, or single instances of

5    misconduct, are insufficient to establish a municipal custom. *Sabra v. Maricopa Cnty. Cmty. Coll.*

6    *Dist.*, 44 F.4th 867, 884 (9th Cir. 2022).

7          Although Plaintiffs allege that Defendants acted pursuant to an expressly adopted official

8    policy or a longstanding practice or custom of the County, FAC ¶ 104, they have not identified any

9    specific policy. They also argue that because Defendants were not penalized in connection with Mr.

10   Starks' death, the County maintained and encouraged various unconstitutional customs. *Id.* ¶ 105.

11   But even were that true, *arguendo*, there is no causal connection to Mr. Starks' death. There is

12   ultimately no evidence linking any alleged County custom to the incident underlying this action.

13                          **3.     Ratification**

14         Ratification of a subordinate's decisions by an official with final decision-making authority

15   can be considered a policy to support *Monell* liability. *City of St. Louis v. Praprotnik*, 485 U.S. 112,

16   127 (1988). A decision is considered ratified if the authorized policymakers approve a subordinate's

17   decision and the basis for it. *Id.*

18         Plaintiffs contend that the County approved of the Deputy Defendants' actions because it

19   found them to be within the County's official policies. FAC ¶ 120. Once again, these conclusory

20   allegations are also not supported by any admissible evidence in the record.[5]

21

22

23

24

25

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [5] Because the Court finds Defendants are entitled to summary judgment on the merits of Plaintiffs'
     claims, the Court does not address the issue of whether Defendants are entitled to qualified
28   immunity.

1    **V.     CONCLUSION**

2         For the reasons discussed above, Defendants' Motion for Summary Judgment is granted in its

3    entirety.

4

5    Dated:     September 13, 2024

6    _____

7                          Hernán D. Vera
                     United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28